Filed 3/18/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JON WOODS,<br><br>    Defendant and Appellant. | G061948<br><br>(Super. Ct. No. 17CF1373)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick H. Donahue, Judge. Affirmed in part and reversed in part.

Burke E. Strunsky and Rod Pacheco for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

*            *            *

A jury convicted Jon Woods of 37 felony counts of workers' compensation fraud. Woods was a worker's compensation attorney who had made business arrangements that involved unlawful kickback and referral fees. As we explain in greater detail below, the scheme generally involved referring copy and subpoena work to companies who were providing various undisclosed financial benefits to Woods and his firm. In the context of the workers' compensation system, this type of corruption is particularly pernicious because the *employer's* insurance company has to pay for the *employee's* costs. Woods raises various issues on appeal.

First, and foremost, Woods contends that the *Williamson* rule precluded convictions on counts 5 through 37.[1] Broadly speaking, the *Williamson* rule states that where the Legislature has defined a *specific* crime with a lesser punishment, the conduct described by that crime may not be charged as a more *general* crime with a harsher punishment. The idea is that by identifying specific conduct, the Legislature has expressed an intent that the conduct by punished at the lower level. Here, counts 5 through 37 were charged under Penal Code section 550, subdivision (b)(3), a felony, which criminalizes concealing or withholding information from an insurance company that would affect an entitlement to an insurance benefit. Woods contends that his conduct is covered by a more specific statute, Labor Code section 139.32. That section makes it a misdemeanor to refer work to third-party servicers in exchange for compensation of any sort. In other words, it criminalizes kickback schemes, which is what Woods was accused of participating in. We agree with Woods that the *Williamson* rule applies under these circumstances, and thus we reverse his conviction on counts 5–

---

[1] *In re Williamson* (1954) 43 Cal.2d 651.

This will also require us to reverse a white-collar sentencing enhancement based on these charges, as well as a restitution award based on these charges.

Woods's other contention is that the court erred by limiting his cross-examination of certain prosecution witnesses. We find the court acted within its discretion and thus affirm the remainder of the judgment.

WORKER'S COMPENSATION OVERVIEW

Because this case involves an abuse of the worker's compensation scheme, and because the relevance of various facts may be difficult to appreciate without an understanding of how the worker's compensation scheme is structured, we begin with a brief overview.

At its core, the Workers' Compensation system represents a grand bargain between employees and employers. (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811 (*Vacanti*)). Employers agree to promptly compensate employees for injuries sustained on the job *regardless of fault*, and employees agree to the limited remedies available under the scheme. (*Ibid.*; Labor Code §3602, subd. (a).) In order to ensure funding is available to injured employees, most employers are required to obtain workers' compensation insurance. (Labor Code, § 3700.)

When an employee files a workers' compensation claim with an employer, the employer generally notifies their insurance company of the claim. "If the employer's workers' compensation insurer accepts coverage, then the insurer substitutes for the employer and assumes liability for benefits owed to the employee under the WCA." (*Vacanti, supra,* 24 Cal.4th 800, 810; Labor Code, §§ 3755, 3757.)

When an employee files a claim, the insurer has 90 days to investigate the claim. "If liability is not rejected within 90 days after the date

the claim form is filed under Section 5401, the injury shall be presumed compensable under this division." (Labor Code, § 5402, subd. (b)(1).)

If a claim is contested, the workers' compensation system provides for various legal expenses to be paid by the insurer *on behalf of the employee*. An employee is entitled to compensation for "medical-legal expenses" necessary to establish an entitlement to compensation. (Labor Code, § 4621; *Vacanti, supra,* 24 Cal.4th at p. 810.) As relevant to this case, "medical-legal expenses" include obtaining medical records. (Labor Code, § 4620, subd. (a).) According to expert testimony at trial, these records are frequently ordered by attorneys and executed by a third-party servicer. In order to be compensable, a records subpoena expense must be "reasonably, actually, and necessarily incurred." (Labor Code, § 4621, subd. (a).) According to the expert testimony at trial, it is ultimately an attorney's responsibility to decide what records to subpoena under that standard.

This legal framework surrounding subpoenas is a unique aspect of practicing law in the realm of workers' compensation. In other fields, the attorney typically absorbs the costs of issuing a subpoena. This creates an incentive for the attorney to keep costs down. In the workers' compensation field, by contrast, the employer's insurer absorbs *the employee's* subpoena costs.

Given this dynamic and the potential for abuse that it creates, the Legislature has passed laws to protect insurers and the overall workers' compensation system. To begin with, the Legislature has made it a crime to participate in a kickback scheme. Under Labor Code section 139.32, subdivision (c), it is illegal for an attorney to "refer a person for services provided by another entity, or to use services provided by another entity, if the other entity will be paid for those services . . . and the [attorney] has a

4

financial interest in the other entity." Attorneys are also required to disclose any financial interests they have in a services provider. (Lab. Code, §139.32, subd. (b).) Additionally, in every contested case, attorneys have to submit a form under penalty of perjury affirming that they not engaged in any kickback scheme with regard to "any referred examination or evaluation." (Lab. Code, §4906, subd. (h).) To prevent over billing of subpoenas, the Legislature passed a law stating that, before billing for subpoena services, employees' attorneys had to first attempt to obtain the documents informally from the employer/insurance company. (Lab. Code, § 5307.9.)

With that overview, we turn to the facts of the case.

## FACTS

Defendant Jon Woods is an attorney who specialized in workers' compensation law and formed a law firm exclusively dedicated to representing employees. Woods began his firm in 2001. By 2011, appellant had hired between 15 and 25 employees to work at his law firm. Up to that point, Woods marketed his services using print, radio, and television advertisements.

## I.

### THE ARRANGEMENT WITH EDGAR GONZALES

Edgar Gonzales owned a copy services business called USA Photocopy in the City of Santa Ana. Woods began working with USA Photocopy in approximately 2007.

USA Photocopy, among other things, provided subpoena services for workers' compensation attorneys. This sometimes involved going to an attorney's office to copy files, bringing them back to the copy center, and preparing subpoenas. But Woods normally e-mailed files to USA Photocopy. USA Photocopy would then prepare the subpoena, serve it, and then pick up

5

the documents once they were ready. USA Photocopy then billed the insurance company for the services.

USA Photocopy paid for some of Woods's business expenses. Most notably, beginning in 2010, USA Photocopy paid the salary of certain employees that were hired by Woods and working at his law firm. Woods's firm determined the person's salary and e-mailed USA Photocopy the amount to be paid to that employee. At any given time, this arrangement applied to two or three of Woods's employees.

II.

THE ARRANGEMENT WITH CARLOS ARGUELLO

In 2011, Woods met Carlos Arguello. His business relationship with Arguello would become a central focus of the trial.

Arguello ran several companies, the primary business being a marketing company called, at one point, Centro Legal Internacional (his companies went by several different names). Ostensibly, Arguello's company offered advertising services to obtain workers' compensation clients. Arguello's company advertised in print, radio, television, and online. At one point, Arguello's company was distributing 4,000,000 fliers per month.

Arguello would promise attorneys a certain number of clients per month, depending on how much the attorney was willing to pay per month. As Arguello explained, "the more investment they would generate, the more clients they would receive." In theory, the way the arrangement would work was that a potential client would call Arguello's call center, which was located in Tijuana, and the call center would initiate a three-way call with a lawyer so the caller could retain the lawyer directly. However, how it actually worked in many instances is that Arguello's company would send a non-lawyer representative to the caller's house to sign a legal services agreement,

6

and only afterward the case would be assigned to one of the lawyers who had retained Arguello's services. Woods received clients this way.

Arguello had agreements with certain doctors. When Arguello would sign up a client for legal services, he would immediately schedule an appointment for the client with a doctor in his network. Having the network of doctors was an essential part of making Arguello's advertising business profitable. Otherwise, his advertising business was running at a loss. Woods allowed Arguello to employ his network of doctors for the cases sent to Woods.

Arguello also owned and operated copy services businesses. Those included C&E Technology and Professional Documents Management. Using Arguello's copy service for subpoenas was a condition of engaging his advertising service. Arguello imposed this condition because, otherwise, it was not profitable for him to perform the advertising services. In some cases, records would be subpoenaed by Arguello's company without an attorney ever looking over the records request to see if the documents were actually needed. Part of Arguello's standard sign-up process with clients was to obtain an authorization from the client to obtain records by way of subpoena.

Woods initially signed up as a client of Arguello's advertising service around March of 2011. Woods initially signed up for $10,000 per month, which would translate to approximately 20 clients for the month. According to Arguello, attorneys made on average $3,000 per client at a cost of $500 per client. The parties signed a contract, though the contract did not mention the copy service, the provision of signed up clients, or that a call center in Tijuana was used. However, all of these aspects were discussed with Woods, including the use of Arguello's network of doctors. Arguello and Woods came to an understanding that Woods would send files to Arguello's copy services business. The number of cases Woods would send to Arguello's

copy service was equal to the number of clients Arguello produced for Woods. Woods was not required to send the exact clients Arguello produced because, according to Arguello, that "would look questionable," but the numbers were to equal out. It would look "questionable" because "it would look like an obligation that he has to use the service." In total, over the course of their relationship, Arguello assigned at least 2,944 cases to Woods. Woods assigned 2,688 cases to Arguello's copy service.

Woods worked with Arguello through 2017. Over the course of their relationship, Woods paid Arguello's businesses $1,425,000 in fees for advertising services.

Arguello pleaded guilty to federal criminal charges related to worker's compensation fraud and was sentenced to four years in federal prison, which he began serving in July 2019. Arguello also pleaded guilty to charges brought by the Orange County District Attorney. His maximum prison exposure under the state charges was 18 years, 8 months. Part of the factual basis for his plea involved a conspiracy with Woods to refer clients for compensation. Arguello was sentenced to ten years in prison on the state charges, but execution of the sentence was suspended in lieu of eight years of probation. As part of that guilty plea, Arguello signed a cooperation agreement in which he agreed to testify truthfully.

### III.

#### THE ALLEGATIONS AGAINST WOODS

According to the Attorney General, there are four aspects of Woods's relationships with Gonzales and Arguello that were illegal. First, Arguello's businesses operated as a runner or capper service in violation of Labor Code section 3215 because Woods paid Arguello to solicit clients for him. Second, Arguello was providing not merely referrals, but fully signed

8

and retained clients prior to any interaction with Woods. Third, the relationship involved a quid pro quo where Arguello would provide clients to Woods in exchange for Woods providing clients for Arguello's copy service and network of doctors. A quid pro quo was also present in Woods's relationship with Edgar Gonzales, where Woods funneled subpoena work to USA Photocopy in exchange for USA Photocopy paying the salary of Woods's employees. Fourth, the relationship with Arguello involved an illegal cross-referral service where clients were required to visit physicians selected by Arguello.

## STATEMENT OF THE CASE

In 2019, the Orange County District Attorney filed an amended information alleging 37 felony counts against Woods. Count 1: Woods conspired with Arguello to refer workers' compensation clients for compensation in violation of Labor Code section 3215 and Insurance Code section 1871.4 (Pen. Code, § 182, subd. (a)(1)). Counts 2–4: Woods unlawfully solicited, accepted, and referred business to and from multiple entities with the knowledge that—or with reckless disregard for whether—that entity intended to violate Penal Code section 550 and Insurance Code section 1871.4 (Pen. Code, § 549). Counts 5–37: Woods unlawfully concealed and knowingly failed to disclose something affecting an entity's right to an insurance benefit and payment (Pen. Code, § 550, subd. (b)(3)). Counts 5–37 were structured identically, with each count referring to a different insurance company. The information also alleged an aggravated white collar crime enhancement for participation in a pattern of related fraudulent schemes involving the taking of more than $500,000 during the commission of counts 5 through 37 (Pen. Code. § 186.11, subd. (a)(1)).

9

Woods demurred to counts 5 through 37, arguing the *Williamson* rule precluded prosecution. The court denied the demurrer.

In April 2019, the jury was unable to reach a unanimous decision, and Woods's first trial ended in a mistrial. The jury was split 8–4 in favor of guilt.

In Woods's second trial in August 2022, the jury found Woods guilty on all counts and found the white collar enhancement allegation to be true. The trial court sentenced Woods to the low term of two years on Count 5, plus two years for the white-collar enhancement. The court sentenced Woods to the low term on all remaining counts and ran the counts concurrently. Woods's total prison sentence was four years. Woods was ordered to pay restitution in the amount of $701,452. Woods appealed.

DISCUSSION

I.

COUNTS 5–37 FALL AFOUL OF THE *WILLIAMSON* RULE

Woods's first contention is that by operation of the *Williamson* rule, Penal Code section 550, which was the legal basis of counts 5–37, did not apply to his conduct. We begin by explaining the *Williamson* rule.

*A. The Williamson Rule*

"Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86 (*Murphy*).) "The doctrine that a specific statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out legislative intent. The fact that the

10

Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and 'requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . . and the special provision . . . .' [Citation.]" (*People v. Jenkins* (1980) 28 Cal.3d 494, 505–506 (*Jenkins*).)

"Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.'" (*Murphy, supra,* 52 Cal.4th at p. 86.) There does not need to be perfect overlap between the general and specific statutes: "It is not correct to assume that the [*Williamson*] rule is inapplicable whenever the general statute contains an element not found within the four corners of the 'special' law. Rather, the courts must consider the *context* in which the statutes are placed. If it appears from the entire context that a violation of the 'special' statute will necessarily or commonly result in a violation of the 'general' statute, the *Williamson* rule may apply even though the elements of the general statute are not mirrored on the face of the special statute." (*Jenkins, supra,* 28 Cal.3d at p. 502.)

"On the other hand, if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the general statute. In such situations, because the general statute contemplates

11

more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely." (*Murphy, supra,* 52 Cal.4th. at p. 87.)

*B. The Statutes at Issue*

Turning to the application of the *Williamson* rule here, we begin with the more general statute, which is the statute that formed the legal basis for counts 5 through 37. Penal Code section 550, subdivision (b)(3), states, "(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:" "(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled." Here, the People's theory is that Woods knowingly failed to disclose the kickback scheme associated with the subpoena work. Because it is illegal under Labor Code section 139.32, subdivision (f), for an insurer to pay for services procured pursuant to a kickback scheme, the failure to disclose the kickback scheme affected the entitlement to an insurance payment. Violation of section 550, subdivision (b)(3), is a wobbler (i.e., it can be charged as a felony or a misdemeanor). (Pen. Code, § 550, subd. (c)(3).)

Contrast that with Labor Code section 139.32, subdivision (c), which is the more specific statute that Woods contends is applicable: "it is unlawful for an [attorney] . . . to refer a person for services provided by another entity, or to use services provided by another entity, if the other entity will be paid for those services pursuant to [the workers' compensation system] and the [attorney] has a financial interest in the other entity." "Financial interest" is broadly defined to include any form of compensation, rebate, refund, or payment, or any agreement for compensation based on the

12

referrals. (Lab. Code, § 139.32, subd. (a)(1).) A violation of Labor Code section 139.32 is a misdemeanor. (Lab. Code, § 139.32, subd. (g)(1).)

A notable difference between these statutes, and the difference the Attorney General focuses on, is that Penal Code section 550 requires a "knowing" fraud, which has been interpreted to require specific intent, whereas Labor Code section 139.32 is a general intent crime. (See *People v. Blick* (2007) 153 Cal.App.4th 759, 772 [Penal Code section 550, subdivision (b)(3), requires the intent to defraud].) Woods recognizes this difference, acknowledges that the two crimes do not share identical elements, but contends the *Williamson* Rule applies under its second circumstance: a violation of Labor Code section 139.32 will necessarily or *commonly* result in a violation of Penal Code section 550, subdivision (b)(3).

To better understand how the word "commonly" is used here, a few examples from caselaw will be helpful.

In *Murphy,* the defendant submitted a false report stating that her vehicle had been stolen. (*Murphy*, *supra,* 52 Cal.4th 81 at p. 84.) She was convicted of a felony charge of offering a false instrument for filing in a public office. (Pen. Code, § 115, subd. (a).) On appeal, she argued that, under the *Williamson* rule, she was guilty of no more than making or filing a false report of a vehicle theft under Vehicle Code section 10501, subdivision (a). (*Murphy*, *supra,* at pp. 84-85.) The People argued that because Penal Code section 115 applies to an "instrument," and false vehicle thefts can be reported orally, the *Williamson* rule did not apply. (*Id.* at p. 89.) Our high court disagreed. The court noted that the state-wide form used to report vehicle thefts, CHP Form No. 180, calls for a signature under penalty of perjury. Thus, even if making a report of a stolen vehicle is possible in other ways, it will *commonly* be done by filing an instrument. (*Id.* at p. 94.)

13

"Accordingly, under the *Williamson* rule, we infer that the Legislature, in specifying that such conduct constitutes a misdemeanor, intended to create an exception to the felony punishment specified in the more general statute." (*Id.* at pp. 94-95.)

In *People v. Ruster* (1976) 16 Cal.3d 690 (disapproved on other grounds in *Jenkins, supra,* 28 Cal.3d 494 at pp. 503-504 fn.9), the defendant was convicted of multiple counts of forgery based on unemployment insurance fraud. On appeal, he argued that the *Williamson* rule applied because Insurance Code section 2101 made it a misdemeanor to obtain unemployment benefits by means of a fraudulent representation. (*Ruster,* at p. 693-694.) The People argued the *Williamson* rule did not apply because the Insurance Code did not require the defendant to actually sign the name of another, as was required by forgery. The court rejected that argument, concluding that "signing eligibility questionnaires and pay certification cards with a false name, is apparently one of the most common forms of unemployment insurance fraud." (*Id.* at p. 699.)

By contrast, in *People v. Watson* (1981) 30 Cal.3d 290, the defendant was convicted of second degree murder by means of striking and killing someone while driving intoxicated, knowing full well that intoxicated driving was dangerous to human life. The defendant argued that the *Williamson* rule precluded his conviction because vehicular manslaughter was a more specific statute. (*Id.* at p. 295.) The court rejected that argument. (*Id.* at p. 294.) The court noted that second degree murder requires implied malice, whereas vehicle manslaughter requires only gross negligence. (*Id.* at p. 296.) The element of implied malice entails "a higher degree of culpability . . . ." (*Id.* at p. 297.)

The court likewise rejected application of the *Williamson* rule in *People v. Powers* (2004) 117 Cal.App.4th 291. There, the defendant was charged with filing a false instrument in violation of Penal Code section 115 when he filed a false fishing activity report with the Department of Fish and Game. The defendant argued the *Williamson* rule applied because a Fish and Game Department regulation required him to maintain and submit accurate records of fishing activities, a violation of which was a misdemeanor. (*Id.* at p. 298.) The court found the *Williamson* rule inapplicable because a violation of the regulation "will not necessarily, or even commonly, result in a violation of section 115." (*Id.* at p. 299.) The court noted that the regulation could be violated by simply failing to maintain a record at all, which would not amount to forgery. (*Ibid.*) Moreover, Penal Code section 115 had a scienter requirement of "knowingly" offering a false instrument, and the regulation did not. Thus, Penal Code section 115 was aimed at "more egregious conduct." (*Ibid.*)

From these cases, we derive a few guiding principles. First, our touchstone must be legislative intent. The goal here is to determine whether the Legislature intended a lighter punishment for conduct that satisfies the more specific statute. Second, though the word "commonly" is used, we think what courts really mean is *usually*. Imagine two overlapping circles in a Venn diagram: there should not just be some overlap for the doctrine to apply, there should be extensive overlap. This makes sense—the more extensive the overlap, the stronger the inference that the Legislature meant to displace application of the more general statute. Finally, the doctrine is more likely to apply where the special statute identifies highly specific conduct. Returning to the image of a Venn diagram, the *Williamson* rule is more likely to apply when the circle representing the specific statute is significantly smaller than

15

the circle representing the more general statute. In short, courts should be looking for a narrowly applicable statute with extensive overlap.

Applying these principles here, we conclude the *Williamson* rule applies. Labor Code section 139.2 is a narrowly applicable statute that describes conduct that is usually fraudulent in nature. Labor Code section 139.32 arises in a specific context to address a specific problem. The context is the workers' compensation system, and the statute addresses the specific problem of kickbacks and cross-referrals that take advantage of the unique aspect of the system that the opposing party (i.e., the insurance company) pays certain costs.

The fact that Penal Code section 550, subdivision (b)(3), contains an additional element does not change our conclusion. Penal Code section 550, subdivision (b)(3), requires a *knowing* concealment or failure to disclose. Although that element is not technically present in Labor Code section 139.3, subdivision (c), there will nearly always be a concealment or intentional failure to disclose a kickback scheme, particularly when, as here, the scheme involves an attorney who will usually be fully aware of the fact that the kickback scheme is illegal. Indeed, the prosecutor below made this exact point in closing argument: "The whole point is to conceal it. The whole point is to not disclose the fact that there is a referral scheme so they can make money." *In theory*, an attorney might unknowingly engage in a kickback scheme. But we view that as a rare case. Moreover, it is quite obvious, particularly in light of the history of fraud and abuse in the workers' compensation realm, that the purpose of a kickback scheme is to take advantage of the insurance company. Thus, while Penal Code section 550, subdivision (b)(3), and Labor Code section 139.32, subdivision (c), technically have different scienter requirements, a violation of the Labor Code section

16

will usually satisfy the specific intent required of the Penal Code section. By making a violation of Labor Code section 139.32 a misdemeanor, we conclude the Legislature intended that section to operate as the exclusive punishment scheme for the conduct described therein.

Tellingly, in this case the People's theory of how Woods violated Penal Code section 550 was precisely *that he violated Labor Code section 139.32*. According to the People, the reason the kickback scheme "affect[ed] any person's . . . entitlement to any insurance . . . payment" under Penal Code section 550 was that insurance companies are not allowed to disburse payments derived from an illegal referral scheme under Labor Code section 139.32. (See Lab. Code, § 139.32, subd. (f) ["An insurer . . . shall not knowingly pay a charge or lien for any services resulting from a referral . . . or use of services in violation of *this section*."] (Italics added).) This only confirms our conclusion that a violation of Labor Code section 139.32, subdivision (c), will usually result in a violation of Penal Code section 550, subdivision (b)(3). Accordingly, the *Williamson* Rule applies, and we will reverse Woods's conviction on counts 5–37.

Because we are reversing counts 5–37, we must also reverse the white-collar enhancement, which was based solely on counts 5–37. Additionally, we must reverse the restitution award in favor of the insurance companies, which was likewise based on counts 5–37.[2]

---

[2] It is unclear to us whether a similar restitution order would be appropriate based on counts 1–4. Our holding is without prejudice to the court reissuing a restitution order if appropriate.

17

## II.

### THERE WAS NO ERROR IN LIMITING CROSS-EXAMINATION

Woods's second contention is that the court made two errors in limiting cross-examination of prosecution witnesses. First, the court limited Woods's ability to cross examine Arguello and his purported *ongoing* illegal marketing activities. Second, it limited the scope of cross examination of certain witnesses from insurance companies. We address each in turn.

*A. Limitation on Cross-Examination of Arguello*

Prior to trial, Woods served discovery requests aimed at uncovering ongoing workers' compensation fraud by Arguello from 2019 through the present. This time period was well after Woods had ended his relationship with Arguello. Woods justified the discovery request as relevant to Arguello's credibility: "Carlos Arguello's character is crucial to the defense of this case and against the People's allegation of a conspiracy to commit insurance fraud. This evidence is important to the defense to show, for example, that Carlos Arguello is lying to the jury in exchange for the People's decision to turn a blind eye as to his ongoing illegal marketing . . . ." Woods served several subpoenas duces tecum to various individuals and companies in pursuit of this evidence, resulting in over 7,000 pages of documents. The People filed a motion in limine to exclude this evidence, arguing it was irrelevant, would consume undue time, and would mislead the jury.

The court granted the People's motion. It reviewed the various attachments submitted by Woods and concluded they "do not implicate him in any crime." The court also noted that Arguello was in prison for much of the time period during which Woods alleged he was engaging in illegal marketing. The court went on, "It is speculative as to what Carlos Arguello –

whether he was committing a crime, and that would require practically a trial within a trial to find out."

Woods contends this was error. He contends the ongoing criminal activity "undeniably evinced moral turpitude and a motive to lie to insulate himself from additional new charges." Arguello was, in the prosecutor's own words, the People's "star witness." Thus, the evidence was, Woods's view, "highly probative."

Where Woods's argument falters, however, is that he has not connected the dots to any evidence of criminal activity in the record. In other words, he has not even attempted to show that the court was wrong in finding that the proffered evidence did not show criminal activity, was speculative, and would require a trial within a trial to determine. That leaves us in the position of assessing whether, given the court's broad discretion under Evidence Code section 352, it was an abuse to preclude cross examination of ongoing criminal activity when there was no plausible evidence of ongoing criminal activity. The People have described this as a "fishing expedition," and we agree. The court was plainly within its discretion in prohibiting that line of questioning.

B. *Limitation of Cross-Examination of Insurance Witnesses*

As part of the People's case in chief, they introduced testimony from 17 different witnesses representing different insurance companies. The witnesses were custodians of records who would lay a foundation and introduce the amount billed to each insurance company by each copy service, to show how much was paid, and to affirm that the insurance company would not have paid had it known of the referral scheme. Prior to trial, the People filed a motion in limine to "limit the cross-examination of these witnesses to the scope of direct examination. Specifically, as was the ruling in the first

19

trial, to prohibit cross-examination about each specific bill and invoice listed on the spreadsheet . . . ."

The court granted the motion, concluding that "[a] cross-examination of each claim would cause a problem under Evidence Code section 352. It would require an undue consumption of time."

Woods contends this was an abuse of discretion. He argues, "limitations imposed on cross-examination of the insurance witnesses unduly restricted Appellant's ability to present a full and fair defense. Specifically, the restrictions hindered Appellant's full capacity to refute the presence of fraud, which is an element of Penal Code section 550(b)(3), counts 5 through 37, and the enhancement pursuant to Penal Code section 186.11."

We disagree. The fraud theory pursued by the People was the concealment of the referral scheme; it had nothing to do with the details of the individual claims being submitted to the insurance companies. There was little relevance to those details, and the court acted well within its discretion in concluding the details would consume undue time. In any event, if the proffered cross-examination was only relevant to defending counts 5 through 37 and the white-collar enhancement, any error would be rendered harmless by the fact that we are reversing those counts and the white-collar enhancement.

## DISPOSITION

As to counts 5 through 37, the judgment is reversed. The white-collar enhancement imposed pursuant to Penal Code section 186.11, subdivision (a)(1), is also reversed. The restitution order of $701,452 is reversed without prejudice to the court reassessing restitution at a new sentencing hearing. In all other respects, the judgment is affirmed.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


DELANEY, J.